IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) No.   1:21-cr-28-6 (APM) |
| | ) |
| GRAYDON YOUNG, | ) |
| | ) |
| **Defendant.** | ) |

**SENTENCING MEMORANDUM IN SUPPORT OF GRAYDON YOUNG**

The Defendant, Graydon Young, by and through counsel, Desiree Wilson, Esq., respectfully submits this sentencing memorandum in connection with the above-captioned matter. Counsel for Mr. Young respectfully requests this Court sentence Mr. Young to time served, credit for time served, followed by three years of supervised release, no fine, a special assessment of $100 per count Mr. Young pled to for a total of $200, and restitution as set forth in the plea agreement. This sentence is sufficient to reflect the seriousness of Mr. Young's offense, accounts for his early and complete acceptance of responsibility, and also appropriately reflects the considerable assistance to law enforcement Mr. Young provided pursuant to his cooperation plea agreement.

**I.     IMPACT OF *FISCHER***

In *United States v. Fischer*, the United States Supreme Court clarified the elements of a charge pursuant to 18 U.S.C. § 1512(c)(2). Specifically, the Court held that the Government bears the burden of proving the defendant "impaired the availability or integrity for use in an official proceeding of records, documents, objects, or as we earlier explained, other things used in the proceeding, or attempted to do so." *Fischer*, 603 U.S. ----, 144 S. Ct. 2176 (June 28, 2024). Mr. Young agrees the facts set forth in his original Statement of the Offense (ECF # 250) and in the Addendum to the Statement of the Offense are legally sufficient to establish an attempted violation

of 18 U.S.C. § 1512(c)(2). That is, Mr. Young agrees these facts set forth a sufficient factual basis to support his guilty plea. Mr. Young is prepared to be placed under oath prior to his sentencing to adopt the supplemental statement of the offense and attest to his understanding of the elements of his charge pursuant to 18 U.S.C. § 1512(c)(2).

## II.   FACTUAL BACKGROUND

Mr. Young adopts the factual background set forth in the Statement of the Offense in support of his plea agreement (ECF # 250), and the recently-filed Addendum to the Statement of the Offense.

## III.   PLEA AGREEMENT

On June 23, 2021, Mr. Young entered a guilty plea to Counts 1 and 2 of the Fourth Superseding Indictment. Count 1 charged Conspiracy in violation of 18 U.S.C. § 371, and Count 2 charged Obstruction of Congress, in violation of 18 U.S.C. § 1512(c)(2).

## IV.   SENTENCING GUIDELINES ANALYSIS

### A. Calculation in Plea Agreement and Presentence Investigation Report

When Mr. Young entered into his plea agreement, he agreed to two offense characteristics which have since been deemed to not apply to the facts of Mr. Young's case. Specifically, Mr. Young agreed to a Guideline calculation which included a three level enhancement for substantial interference with the administration of justice pursuant to U.S.S.G. § 2J1.2(b)(2). In *United States v. Brock*, 2024 WL 875795 (D.C. Cir. March 1, 2024), the Court held "administration of justice" does not apply to Congressional certification of electoral college votes. *Brock*, 2024 WL at *8. The Court held "administration of justice" refers to "judicial, quasi-judicial, and adjunct investigative proceedings, but does not extend to the unique congressional function of certifying electoral college votes." *Id.* Therefore, in a case like Mr. Young's, where the substantial

2

interference with the administration of justice involved solely conduct which interfered with the certification of electoral college votes, the three level enhancement cannot apply. *Id.* at *15; U.S.S.G. § 2J1.2(b)(2).

The same case also results in the eight level enhancement for "causing or threatening to cause physical injury to a person or property damage in order to obstruct the administration of justice" being inapplicable to defendants like Mr. Young whose conduct involved solely Congress' certification of electoral college votes. *Id.*; U.S.S.G. § 2J1.2(b)(1)(B).

Therefore, the following Sentencing Guidelines calculation should apply:

| U.S.S.G. | Description | Level |
|---|---|---|
| U.S.S.G. § 2J1.2 | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation | +2 |
| U.S.S.G. § 3C1.1 | Obstruction (destroying documents) | +2 |
| U.S.S.G. § 3E1.1(a) | Acceptance of Responsibility | -3 |
| | **Total** | **15** |

At level 18, the recommended sentencing range would be 18-24 months of incarceration.

### B. Downward Departure for Substantial Assistance

Mr. Young respectfully requests the Court grant the Government's Motion for Downward Departure pursuant to U.S.S.G. § 5K1.1. Section 5K1.1 provides several factors the Court should consider in determining whether to apply a downward departure pursuant to U.S.S.G. § 5K1.1. They are:

  (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

  (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

  (3) the nature and extent of the defendant's assistance;

  (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

      (5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a).

      First, the assistance Mr. Young provided was significant and useful. Mr. Young volunteered his willingness to cooperate almost immediately after he was arrested. Because he offered his cooperation so early in the process of the Government's ongoing investigation and prosecution of these cases, the usefulness of the information Mr. Young provided was maximized and the Government was able realize the full potential of investigatory and prosecutorial power of the evidence Mr. Young provided. Mr. Young's assistance consisted of numerous lengthy proffers, testimony before the grand jury, trial preparation sessions, and Mr. Young's difficult, compelling, detailed, emotional, and highly credible trial testimony in a public trial of national significance and interest. That assistance tangentially assisted the Government in obtaining convictions in another trial in which he was not called upon to testify (but stood ready, willing, and able to do so) – the one in which his own sister was a defendant.

      The significance and usefulness of the cooperation Mr. Young provided extended beyond these acts, though. Mr. Young's cooperation not only had a significant effect on the Government's success in prosecuting the case of which Mr. Young was a defendant, but also on other cases the Government prosecuted nationally. As more defendants were convicted after trial, more defendants on a national level elected to enter plea agreements. The effects of Mr. Young's cooperation continue to ripple through not only his own case, but also to other similar cases on a national level, on the national public sentiment and understanding of the January 6 events, and on the national political conversation concerning these events. His cooperation was so incredibly influential – so substantial – that it cannot possibly be numerically quantified. Put directly, it was of historical significance.

So significant was Mr. Young's cooperation that his trial testimony was featured in a report by the House Select Committee to Investigate the January 6th Attack on the United States Capitol. Mr. Young's willingness to testify at trial forthrightly and reliably about what transpired before, during, and after the January 6 insurrection aided the Committee's investigation and provided critical insight into a national and official understanding of what caused the events, and as a natural result, contributed to the shaping of the national political discourse related to the events.

The second factor also weighs significantly in favor of a downward departure. Mr. Young's cooperation was truthful, complete, and reliable. The information Mr. Young provided was consistently corroborated by other evidence in his case and in other cases as the investigations progressed. Because the information Mr. Young provided was truthful, complete, and reliable, the Government was able to use Mr. Young's testimony during grand jury proceedings and in a public trial. During his trial testimony, Mr. Young presented as genuine, sincere, honest, and very credible. His trial testimony also highlighted the remorse he continues to feel to this day about his role in these events.

The third factor favors a downward departure. Mr. Young's cooperation began virtually immediately after he was arrested and continued for years thereafter as these investigations continued and as the cases were litigated. He shared considerable information about the facts leading up to the January 6 events, the parties involved, their respective roles, the January 6 events themselves, and all information at his disposal concerning what transpired after the events of January 6. Mr. Young's cooperation shed light on other defendants' roles, but importantly, Mr. Young was also completely forthcoming about his own transgressions, plans, statements, and actions. All of this information was utilized by the Government in the course of their ongoing investigations, the active prosecution of numerous defendants, and several trials. Mr. Young

provided his cooperation in the form of several lengthy proffers which required travel, grand jury testimony, an early public cooperation plea agreement, public trial testimony, and his ongoing availability for years to assist the Government if they deemed that assistance necessary.

The fourth factor also strongly favors a downward departure. Mr. Young continues to be severely impacted by the events of January 6, his role in it, and the ongoing litigation associated with it. At his core, Mr. Young is a proud American who loves the United States of America. That passion for his country is what predisposed him to become involved in these events to begin with. That same passion is also what motivated Mr. Young to assist the Government so extensively and so early. Mr. Young always has been motivated by a sense of obligation to his country. While that passion was misguided in terms of his involvement in these events, it is also what brought him to support the United States in these prosecutions.

That passion, willingness, and desire to assist the United States did not come without a personal cost to Mr. Young. Mr. Young should receive recognition and credit for what his cooperation cost him because what it cost him reflects directly on the strength of his resolve to assist the Government and pay penitence for what he did. Mr. Young underwent and continues to undergo monumental stress reactions related to the ongoing litigation. He expressed to counsel, repeatedly, significant fears about his safety and legitimate concerns about retaliation from other defendants, the Oath Keepers organization, and the Proud Boys organization. His family relationships have also been damaged, perhaps permanently, because of the adversarial position in which he was placed with his sister, Laura Steele due to her refusal to accept responsibility. Other family members have cut Mr. Young out of their lives because of his cooperation.

Mr. Young experienced enormous anxiety before every proffer in which he participated, largely owing to how seriously he took his obligation to cooperate. Before he testified before the

grand jury, he was visibly shaking in the anteroom, sweating profusely, and verbalizing his anxieties about providing the testimony. Before he testified at trial, he had similar reactions. At trial and during his trial testimony, he broke down crying.

In addition to the damage to his familial relationships, the colossal personal stress he experienced for years, Mr. Young was also civilly sued by the Attorney General of the District of Columbia for his role in these events. His cooperation in this case severely limited his defenses in the civil case, resulting in him choosing to allow his case to default against him and declaring bankruptcy.

On top of all of this, Mr. Young experienced negative backlash from his local community related to his public cooperation and his role in these events. He and his family came out of all of this much more isolated from their local community than they were previously. Directly drawing from that reaction, Mr. Young's family's business suffered financially.

Finally, because he cooperated early and publicly and was one of the first defendants to enter public cooperation agreements, Mr. Young and his wife received countless hate communications from unknown sources, threatening phone calls, and threats to his life and the lives of his loved ones. One such threat was particularly disturbing and conveyed such a credible threat that it required Federal Bureau of Investigation involvement in order to identify the individual responsible for the threat. Needless to say, the death threat was horrifying to Mr. Young, extremely upsetting, and invoked considerable fear in him for his safety and the safety of his family.

Finally, the fifth factor also weighs heavily in favor of a downward departure. Mr. Young approached the Government – not the other way around – almost immediately after his arrest to offer his cooperation. He was one of the first defendants in the entire country to accept

responsibility by offering cooperation, he was the first defendant in his case to cooperate and plead guilty, and was one of the first defendants in the country to enter a public cooperation plea agreement with the Government.

Because he agreed to cooperate and plead so early in the process of the Government's ongoing investigation and prosecution of these cases, the level of risk Mr. Young assumed in doing so was among the highest in the country. He cooperated when the public at large was still largely unsettled as to their views on the events of January 6. He did so when there was still enormous legal uncertainty attendant to the charges, the thoroughness of the investigation, the full scope of the available evidence, the number of prosecutions which would result, the number and types of convictions which could be obtained, or the sentences which would ultimately be imposed.

In fact, Mr. Young agreed to cooperate and pled guilty at a time in this case when there was significant legal uncertainty as to the language "official proceeding" in 18 U.S.C. § 1512(c)(2). Motions to dismiss were pending at the time he entered his guilty plea. Mr. Young absorbed this risk as well when he entered his plea. Mr. Young did so after extensive consultation with defense counsel about the legal uncertainty related to this charge at the time (and the attendant ramifications falling from this uncertainty) and did not waver in his desire to enter his plea as planned. He was fully aware of the potential for the issue to be raised in his case and the charge itself to be challenged and was also fully aware that other defendants in his case intended to challenge the legal sufficiency of the charge as applied to the facts in this case. None of those risks deterred Mr. Young.

None of these risks deterred Mr. Young because from the beginning, virtually from the time he left the Capitol on January 6, Mr. Young felt enormous guilt and remorse about what he did. He has always been proud to be a citizen in this Country and always held a desire to serve

(and has served) his Country. He held the desire to take full responsibility for his conduct early, and he felt it deeply. His drive to do everything he could to rectify the damage caused by his conduct was and is reflected in the risks he undertook in cooperating so early and so willingly, and in proceeding with his agreed-upon plea even in the face of a great deal of legal uncertainty.

The sentence which is ultimately imposed upon Mr. Young should reflect the risk he took in cooperating so early. It should reflect that Mr. Young took upon himself a far greater burden than the cooperators who followed him – those who only agreed to cooperate or plead after the legal uncertainty was settled, after public sentiment cemented, after other convictions were obtained and it was clear more would follow, and after the vast scope of the evidence and quality of the investigation became apparent. Fairness dictates the higher level of risk Mr. Young bore should translate in some way to a recognition of his higher level of contrition, remorse, and desire to assist the Government.

## V.  FACTORS SET FORTH IN 18 U.S.C. § 3553(A)

### A.  Nature and Circumstances of Offense

Mr. Young cross references his statement of the offense and his addendum to the statement of the offense, as they accurately reflect the nature and circumstances of Mr. Young's offenses. The nature and circumstances of the offenses support the sentence for which Mr. Young advocates.

### B.  History and Characteristics of the Defendant

Mr. Young is an honorably discharged military veteran. He served in the United States Navy Reserves for three years in the late 1990s and then re-enlisted in 2002. He was honorably discharged in 2010. He received a Letter of Commendation and was selected as the Naval Reserve Center St. Petersburg's Blue Jacket of the Quarter for the second quarter of 2003. Mr. Young is an otherwise law-abiding citizen with no criminal history other than a 2008 case involving operating

9

a motorcycle without a license and a few civil traffic citations. Young's history demonstrates he is a responsible citizen who works hard, values his family, and has a principled view of responsibility and obligation to his country.

Mr. Young offers several letters of support in conjunction with this Sentencing Memorandum. These letters were drafted by individuals who know Mr. Young well, and felt a moral sense of obligation to share their views of Mr. Young as the Court considers what sentence would be most appropriate for Mr. Young.

This offense is an aberration in Mr. Young's otherwise law-abiding life, and everything he has done in this case to support the Government demonstrates these events were a complete anomaly in Mr. Young's life. Mr. Young is a responsible citizen who has taken full responsibility for his misdeeds, has taken commendable steps in repentance of those misdeeds, and has done everything he can to rectify any damage caused by his behavior. Mr. Young is also a person who is respected and loved in his community. Attached as Exhibit A are several letters of support from individuals who know Mr. Young well.

    C.   <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law</u>

The sentence Mr. Young requests reflects the seriousness of his offenses and promotes respect for the law. When a short term of incarceration, 3 years of supervised release, and the payment of restitution are paired with everything Mr. Young has gone through in an effort to assist the Government in his case and in others, the requested sentence directly reflects the seriousness of the offense. Additionally, when the requested sentence is paired with Mr. Young's cooperation, it promotes respect for the law; in fact, Mr. Young's cooperation directly helped to shape the public narrative related to the seriousness of these offenses and the need to respect the rule of law. No greater sentence than Mr. Young requests is necessary to accomplish these goals.

D.  The Need for the Sentence to Afford Adequate Deterrence

The sentence Mr. Young seeks will be sufficient to afford adequate deterrence, especially when the magnitude of Mr. Young's cooperation is placed in the context of the sentence. In cooperating early, substantially, and fully, Mr. Young actually assisted in increasing the general deterrent effect of these prosecutions. His early cooperation, plea, and trial testimony was publicized nationally and had a significant role in cementing public opinion in favor of the Government's prosecutions.  It came at a sufficiently early time so as to play a role in shaping the public narrative of condemnation against what took place on that day.  Mr. Young's plea, his agreement to cooperate, and his trial testimony were publicized in countless national press articles, videos, and stories.  One need only search his name on the internet to gain some sense about the impact his decision to cooperate had on the public at large and the citizens of this Country.

Mr. Young's cooperation and his early entry of his plea sent a clear message to would-be participants in this type of conduct across the country that the consequences would be significant and swift.  He sent the message that the Government could prove what happened that day was criminal in nature, that participants can and would be identified and held accountable, and the investigation was sufficient even at that early stage to obtain convictions.

The general deterrent effect of Mr. Young's plea was further augmented by the fact that his cooperation and plea contributed to the Government's ability to lodge numerous additional charges against existing defendants in his case and to add defendants in countless superseding indictments. Mr. Young's cooperation and contributions to the Government's case also undoubtedly played a role in passively persuading numerous defendants across the country to enter guilty pleas in their cases.  His cooperation and plea set the precedent nationally for these cases –

and the impact of that precedent can never be fully measured. It is incalculable and obviously significant.

In addition to the pre-trial general deterrent effect Mr. Young's cooperation and plea had, his cooperation continued through the trials of several co-defendants in his case. His emotional, sincere, and highly credible testimony contributed significantly to the Government's ability to obtain convictions against defendants in the trial in which he testified.

Because Mr. Young's cooperation was so public and so extensive, the sentence Mr. Young requests will still afford adequate general deterrence. It is no mystery to the public that Mr. Young provided significant, valuable information and cooperation to the Government, and the general public understands the sentences of people who come forward in such a way are expected to be considerably less than the sentences of other co-defendants. Specific deterrence is also accomplished with the requested sentence. Mr. Young's remorse has been apparent for the entire pendency of this case, and it continues to impact him. His demeanor during his trial testimony speaks for itself in terms of the level of remorse he feels and the impact these events continue to have on him. Any sentence imposed will be less severe than the emotional burden Mr. Young already places on himself for the guilt he feels over his role in these events.

    E. <u>The Importance of the Guidelines</u>

Mr. Young expects that when the Governments substantial assistance motion is taken into account and if it is granted by the Court, his requested sentence will be compliant with the United States Sentencing Guidelines. Therefore, if the Court imposes the recommended sentence, it will fall within the Guidelines and offer all required respect to the dictates of the Guidelines.

## F. Unwarranted Sentencing Disparities

The sentence Mr. Young requests will avoid unwarranted sentencing disparities. When Mr. Young's position in these cases is compared to that of someone situated quite similarly – his sister Laura Steele – the appropriateness of the sentence he requests is apparent. Ms. Steele's conduct closely mirrored Mr. Young's conduct, although it was admittedly slightly less aggravated factually. However, Mr. Steele took no responsibility, provided no cooperation, and in fact challenged the charges every step of the way. In the end, she was effectively sentenced to one year and one day of imprisonment. Mr. Young's sentence must be considerably less than Ms. Steele's, or the impact of his cooperation will not be demonstrated in his sentence.

Additionally, Mr. Young's sentence should closely mirror that of Caleb Berry, a cooperating defendant in United States District Court for the District of Columbia Case Number 21-CR-460-APM. Mr. Berry pled to the same types of charges to which Mr. Young pled, cooperated in a manner similar to Mr. Young, and engaged in conduct which is nearly identical to Mr. Young's conduct. The Court sentenced Mr. Berry to three years of probation with special conditions of participating in mental health treatment, $500 in restitution, and a $200 financial assessment. Mr. Young's sentence should be no greater than Mr. Berry's. A non-incarcerative sentence is the only sentence which will properly accomplish all of the goals set forth in 18 U.S.C. § 3553, the United States Sentencing Guidelines, avoid unwarranted sentencing disparities, and is the only sentence which will fully accomplish justice.

## VI. RESTITUTION

Mr. Young agreed as a component of his plea agreement to pay $2000 in restitution.

## VII. CONCLUSION

For all the reasons set forth herein, Mr. Young respectfully requests he be sentenced to time served, credit for time served, followed by three years of supervised release, no fine, and that he be ordered to pay restitution and a $200 special assessment.

Respectfully submitted,

/s/ Desiree Wilson
Desiree Wilson, Esq.
FOLEY & WILSON LAW FIRM
Counsel for the Defendant, Graydon Young
Bar # FL 0061
12481 Brantley Commons Court
Fort Myers, FL 33907
Phone: (239) 690-6080
dwilson@federalattorneyflorida.com

# **EXHIBIT A**

**Kathleen and Russel Chalaire**



October 30, 2023

Judge Mehta:

My husband and I have lived in our home for over 43 years. We are both now retired and enjoy our quiet close knit neighborhood.

Graydon Young and his family moved into our neighborhood about 12 years ago and they have fit in very well.

Graydon, whom we call Gray, has been both a great friend and neighbor. He is always there if needed. As we are getting older we are sometimes unable to do certain tasks, projects around our home. Gray has generously stepped in to help with both our tasks and tasks for our adult daughter, Kaitlin, who has her own home in another neighborhood.

As we all struggled after hurricane Ian, Gray was there helping everyone with clean up and repairs. We have seen how close he is with his sons doing many projects together ( working on vehicles and even exercising together). Gray and his family are also church members, we see them head out regularly on Sundays.

Gray has spoken about that day and has expressed genuine remorse about being there. He is more concerned about his wife and family than his own well being. He has asked us to watch over them if perchance he has to be away from them again. He is trying to make amends and has been helping the government when asked. We hope that he has proven himself and that he won't have to spend anymore time away from his family and friends.

Thank you for taking your time to listen.

Yours truly,
Kathy and Rusty Chalaire

*Kathy Chalaire*
*Rusty Chalaire*

Scanned with CamScanner

Your Honor,

I met Stephanie Young, Gray's wife, when we were in 5th grade. We have been close friends ever since. Stephanie is someone who grew up in a close and loving family and wanted the same. She found that when she met Gray and it was easy to see why they clicked. He had so many similar qualities to Stephanie – hardworking and loyal to name a few. I had the honor of being in their wedding 21 years ago and seeing their love and commitment. Stephanie warmly accepted Gray's son from his first marriage (who was a young boy at the time), and they then had two boys of their own who are now wonderful young men. They are also grandparents to a beautiful girl. I watched Gray support Stephanie as she developed her business and observed how they worked together to raise their children.

Fast forward. It was hard to watch he events of January 6, 2021, unfold, and even harder to find out someone I know, let alone the husband of one of my best friends, was involved. I was scared for them, particularly their boys, and like so many didn't understand how Gray could be involved. What quickly became apparent was that Gray felt instant remorse, not just because he was "caught" but because his actions were not in line with his character, and he knew his actions didn't just impact him but also his family and community. What was also quickly apparent was that Gray was not going to run from this. He owned his responsibility immediately and continues to be truthful about his actions.

People make mistakes all the time and this certainly was a huge mistake. What I feel confident about is that this is a mistake that Gray won't repeat. He is remorseful and has learned so many valuable lessons. He is a steadfast and loving husband, father, and grandfather and it is my hope that the Court will see these attributes as the case comes to closure.

Thank you.

Colleen Thayer

I have known Gray Young for over 9 years. He worked for me at Tervis in the IT department, but we quickly became friends. I moved away from Florida in 2016 but stayed in touch with Gray and his family. Gray was always a good friend and supported me and my wife when we had difficulties in Florida, and even offered his home as a temporary location while I was working remote from Texas. Gray puts a lot of his energy into his family and friends and I knew I could count on him.

When I heard about the Jan 6 insurrection and saw that Gray was involved, I was shocked and not sure what to think. The events of that day did not represent the Gray I had come to know, and although he had a strong commitment to his community and country, I did not understand how he became so involved in the actions that happened that day. I reached out to him and found out he was in jail. I wrote to him a few times while he was in jail letting him know that I supported him and his family and would do what I could for them. He was grateful, but also ashamed of his actions and that he let others influence him so much. His contrition was honest and his honor led him to quickly work with prosecutors to tell the truth and bring others to justice. This came at a high cost but his core beliefs (as I know them) would not let him continue to deny reality and claim he was innocent. This was the character of the man I knew and the reason I still call him my friend.

Recently I returned to Florida for a vacation with my wife, and we had dinner with Gray and his wife. The conversation was open and honest and I am positive that the events of that day will never happen again, and he will find ways to put his family, career, and life back together. Rehabilitation is the root of all justice, (not retribution) and Gray represents how a person who makes a mistake can take ownership and responsibility, and society will be better off in the long run helping him return to his community and family. I hope the court and our country can acknowledge those who admit a mistake and take responsibility without lumping them in with all the others who still continue to deny facts and the impact their actions had (and continue to have) on our country.

Blake Whitaker

