**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-28-APM** |
| **GRAYDON YOUNG,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM, AND**
**MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Graydon Young to three years of supervised probation, with the special condition that he perform 120 hours of community service and pay $2,000 in restitution and the mandatory $200 special assessment. Such a sentence would be sufficient to reflect the seriousness of this offense while also accounting for Young's fulsome acceptance of responsibility and substantial assistance to law enforcement.

**I.    INTRODUCTION**

On the afternoon of January 6, when it became clear that Congress was going forward with the certification of the 2020 presidential election, Young marched to the United States Capitol grounds with other members and affiliates of the Oath Keepers. On the way, the Florida Oath Keepers leader Kelly Meggs was on the phone with someone Young understood to be Oath Keepers founder Stewart Rhodes. Afterwards, Meggs told the group, including the Young, that they were going to meet up with Rhodes when they got to the Capitol. Meggs also conveyed to the

1

group that the Capitol had been breached and said something to the effect of: "We're in." The defendant interpreted these words to mean that "it was like a Bastille type moment in history where in the French Revolution it was that big turning point moment where the population made their presence felt." According to Young, "I thought it was going to be a similar type of event for us."

Accordingly, when the group reached the Capitol grounds, they walked up the stairs on the east side of the Capitol in a "stack" formation, with each person keeping a hand on the shoulder of the person in front, and then unlawfully entered the Capitol building. Once inside the building, the group split in half. One half moved towards the U.S. House of Representatives, in search of Speaker of the House Nancy Pelosi. The other half, which included the defendant, joined a mob that tried to push down a hallway to the entrance to the Senate Chamber. Co-conspirator Jessica Watkins, who led this half of the group toward the Senate Chamber, later bragged: "We were in the thick of it.   Stormed the Capitol. Forced our way into the Senate and House. Got tear gassed and muscled the cops back like Spartans."

Young's participation in the attack on the Capitol was not random; it was the culmination of weeks, if not months of increasingly violent calls by Rhodes to oppose the lawful transfer of power from Donald Trump to Joseph Biden. Young was privy to these communications, as a member of the Florida chapter of Oath Keepers. He was aware of the group's discussions about the need to use any means necessary, up to and including the use of force, to stop what they saw as the theft of the election. He understood that the group was bringing a large cache of firearms to D.C. to support these efforts. And he then joined this group in traveling to D.C. and ultimately breaching the Capitol to try to stop the certification proceeding.

At the same time, Young has fully accepted responsibility for these offenses. From the

moment he was arrested by law enforcement in February 2021, Young has been tremendously remorseful for his actions and cooperative with law enforcement. Young gave a voluntary interview upon arrest, began proffering with law enforcement once he hired counsel, and was the first person to plead guilty to a conspiracy offense related to the January 6 attack on the Capitol.

That plea was pursuant to a cooperation plea agreement to one count of Conspiracy, in violation of 18 U.S.C. § 371, and one count of Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2. Young agreed to permit the details of his cooperation plea agreement to be made public. Young then testified before the grand jury and later testified at the trial against the leaders of the conspiracy. Young provided powerful testimony about his and his co-conspirators' intent in breaching the Capitol on January 6, 2021.

Like many who participated in the attack on the Capitol, Young became radicalized after the election by the misinformation that swirled around social media. Unlike many who participated in the attack, however, Young realized almost immediately the wrongfulness of his conduct, and he has been taking steps to atone ever since. His public and brutally honest assessment of his actions is one of several reasons that a probationary sentence is appropriate in this case.

## II.    THE IMPACT OF *FISCHER*

Since Young's guilty plea, in *United States v. Fischer*, the Supreme Court held that to prove a violation of 18 U.S.C. § 1512(c)(2) "the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or as we earlier explained, other things used in the proceeding, or *attempted* to do so." 603 U.S. ----, 144 S. Ct. 2176 (June 28, 2024) (emphasis added). The parties agree that the facts admitted to by Young in his statement of offense during his guilty plea are sufficient to establish an attempted

3

violation of Section 1512(c)(2). Nonetheless, out of an abundance of caution, the parties have attached here an addendum to the Statement of Offense. The parties would ask that the Court place Young under Oath at the start of the sentencing hearing to have him adopt the supplemental statement of offense, to make sure he understands the elements of the offense of obstruction of an official proceeding, as clarified by the Supreme Court in *Fischer*, and to have the parties declare on the record their position that there is a sufficient factual basis to support Young's guilty plea.

### III.    FACTUAL BACKGROUND

#### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 250, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the 2020 presidential election.

#### B.    The Defendant's Role

Young's role in the attack on the Capitol, and the conspiracy by certain members and affiliates of the Oath Keepers to forcibly oppose the lawful transfer of power following the 2020 presidential election, is summarized in the stipulated statement of offense filed in this case, ECF 250, and the supplement statement of offense enclosed here. The Court is also fully aware of the details of Young's conduct, having presided over his testimony at trial.

Young joined the Oath Keepers in December 2020, after the presidential election, because he "felt like something needed to change or be done," and "felt like just going to protests and doing things like that was ineffective." *United States v. Elmer Stewart Rhodes III, et al.*, No. 22-cr-15-

APM, 10/31/22AM Tr. at 5704.[1] As a member of the Florida chapter of the Oath Keepers, Young participated in a number of group chats on an encrypted messaging application called "Signal." One such group chat was entitled, "OKFL Hangout." On that "OKFL Hangout" chat, Young and others discussed the need to take action to oppose what they saw as a fraudulent and stolen election. For example, on December 20, the defendant wrote, "So far they have successfully suppressed and ignored our marches and protests. Something more is required." Gov. Exh. 4659 (Msg. 1.S.656.8787).

    In late December 2020, the group began to focus on January 6, 2021, and the proceeding before Congress that day to certify the election, as a date and occasion for action—with or without the backing of President Trump. On December 23, 2020, Meggs told those on the OKFL Hangout chat: "We need to surround the Capitol all the way around with Patriots screaming so they hear us inside! Scare the hell out of them with about a million surrounding them should do the trick!" Gov. Exh. 9514 (Msg. 1.S.656.9619). He then posted a photograph of Oath Keepers flags and wrote, "These will be flying Jan 6th in front of he Capitol!!" *Id.* (Msg. 1.S.656.9620). The next day, Meggs wrote to the same chat, "We have 10-12 staying there. So it's gonna be a WILD time in DC we gotta get the crowd going during the day. I think we get everyone up good and close to the Capitol bldg so they can here is inside. Then at night well whatever happens happens." *Id.* (Msg. 1.S.656.9990).

    On December 25, 2020, Meggs wrote to the group, "Time for a gut check from everyone in this room. If this is our course where do you fit in. This is where we are, we have been invaded.

---

[1] Subsequent references herein to transcripts and trial exhibits are all from the *Rhodes* trial, unless otherwise stated.

Patriots are going to stand and we have to lead them!" Gov. Exh. 9514 (Msg. 1.S.656.10074). Young responded, "We need MUCH larger numbers PDQ [pretty damn quick]," and expressed his hope that their mission to D.C. would not be a "fool's errand." *Id.* (Msg. 1.S.656.10075, 10095). Rhodes then jumped into the chat to re-assure Young and the other Florida Oath Keepers that it would not be a fool's errand. *Id.* (Msg. 1.S.656. 10096-10097). Rhodes continued, "I think Congress will screw him [President Trump] over," and "[t]he only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing." *Id.* Accordingly, Rhodes told the Florida Oath Keepers, they would show President Trump that they were willing to help him fight to stay in power, and "if he fails to act, then we will. He needs to understand that we will have no choice." *Id.* (Msg. 1.S.656.10102). Young testified that when Rhodes wrote things like, if Trump failed to act, "then we will," he understood this to mean that Oath Keepers "were going there to look for an opportunity to potentially do something about what was going wrong with the election." 10/31/22PM Tr. at 5865.

These types of threats prompted Michael Adams, the leader of the Florida chapter of Oath Keepers prior to Meggs, to resign his position. Adams testified he stepped down because he took Rhodes' words as "telling the President of the United States . . . that if he didn't do this, we were." 12/16/22AM Tr. at 1618-19. Adams said he did not want to be part of that plan. *Id.*

Others, including Young, did want to be part of Rhodes' plan to "scare the shit out of" Congress on January 6. And so, Young joined his co-conspirators from Florida in making arrangements to carry out this objective. They created new encrypted planning chats on Signal with titles like "DC OP: Jan 6 21" and "OK FL DC OP Jan 6." On these chats, they coordinated plans for lodging and transportation and had extensive conversations about what weapons and gear

they would bring, among other details. Gov. Exhs. 9514, 9557. They also held a series of "DC planning" GoToMeetings in the week leading up to January 6. Gov. Exhs. 1525, 1526. Finally, they planned the logistics for the "quick reaction force" ("QRF") that would provide the firepower to support the operation inside D.C. 10/31/22PM Tr. at 5768-71. The co-conspirators' intent in making these plans was clear: as Meggs told one Facebook acquaintance on January 3, "The natives are very restless. Tell your friend this isn't a Rally." Gov. Exh. 6868 (Msg. 2000.T.289).

Understanding these plans, Young traveled to D.C. with his sister to be part of the Oath Keepers' January 6 operation. 10/31/22PM Tr. at 5768-71. Young knew that other members of the group had brought firearms to support the operation, which they would stash with a QRF team in Virginia. *Id.* Young understood that he would have access to and be allowed to use these weapons if needed in furtherance of the operation. *Id.*

On January 6, 2021, Young accompanied the Oath Keepers to the rally at the Ellipse. 10/31/22PM Tr. at 5771-72. Towards the end of the rally, Young marched with at least some of the co-conspirators towards the U.S. Capitol. *Id.*; ECF 250 at ¶12. On the way, Meggs was on the phone with someone Young understood to be Rhodes. 10/31/22PM Tr. at 5773-75. Afterwards, Meggs told the group, including Young, that they "were going to rendezvous with Mr. Rhodes when [they] got [to the Capitol." *Id.* at 5775. Meggs also conveyed to the group "that the Capitol had been breached" and said something to the effect of: "We're in." *Id.* Young interpreted these words to me that "it was like a Bastille type moment in history where in the French Revolution it was that big turning point moment where the population made their presence felt." According to Young, "I thought it was going to be a similar type of event for us." *Id.* at 5775-76.

When the group got to the Capitol, the mood was "energetic and loud." 10/31/22PM Tr. at

5776. It felt as though the crowd was "probably in the process of doing something" about the election and the certification. *Id.* When the crowd recognized the Oath Keepers, they parted and allowed them to move up the steps. *Id.* The members of the group placed hands on shoulder and ultimately entered the building. *Id.* at 5776-79.

Phone records introduced at trial showed that at about 2:32 p.m., Meggs engaged in a phone conversation with Rhodes, who was already on the phone with Greene, the operational leader for January 6. Rhodes merged them into a three-way call. Gov. Exhs. 1500.1. Moments later, Meggs led Line One up the east steps of the Capitol to the area outside the East Rotunda doors, where rioters were using their hands, flags, and chemical spray to assault the officers guarding the doors, and violently trying to force entry. Gov. Exhs. 1500.1. For minutes, the crowd—including Young and his co-conspirators—attempted to break into the Capitol. *Id.* When the doors eventually opened, Meggs motioned for Line One to enter, and they did. *Id.*

Once inside, half of the group followed Meggs in pushing into the House side of the Capitol in search of Speaker of the House Nancy Pelosi. Gov. Exhs. 1500.1, 1506, 9553 (Msgs. 7.T.570.9758, 9760-61); 01/05/23AM Tr. at 3119-29. They stopped in the area of the Small House Rotunda, just outside Speaker Pelosi's suite of offices. 01/05/23AM Tr. at 3119-3129. Meanwhile, Young joined the other half of the group, led by co-conspirator Jessica Watkins, which tried to force their way past riot police to the Senate Chamber. Gov. Exhs. 1500.1, 1505. The government introduced video of Watkins yelling, "Push! Push! Push!" and "Get in there!" and "They can't hold us!" as she and six other co-conspirators joined the mob attempting to push down the hallway towards the Senate Chamber. Gov. Exh. 1505. Only by deploying chemical spray were the officers finally able to repel the rioters and hold their line. Gov. Exhs. 1505. Watkins later described her

conduct in that hallway: "We were in the thick of it.  Stormed the Capitol. Forced our way into the Senate and House. Got tear gassed and muscled the cops back like Spartans." Gov. Exh. 6734 (Msg. 192.T.1521).

Young testified that his actions on January 6 were directly linked to the implicit agreement he had entered into with Rhodes and other Oath Keeper members and affiliates to stop the lawful transfer of presidential power by any means necessary. Young told the jury: "We talked about doing something about the fraud in the election before we went there on the 6th. And then when the crowd got over the barricade and they went into the building, an opportunity presented itself to do something. We didn't tell each other that." 10/31/2022PM Tr. 5853. Rather, in Young's words, it was "common sense." *Id.* Young further explained that he and his co-conspirators had come to D.C. on January 6 prepared to fight against "[t]he corrupt elements in the government that were allowing the election to proceed, and obviously leftists and extremists and whoever else was in the way." 10/31/2022PM Tr. at 5866. Young acknowledged that in so doing, he was "acting like a traitor." *Id.* That testimony provided powerful evidence about the conspirators' aims.

On January 7, 2021, while stopping at his sister's house in North Carolina on his way home to Florida, Young and his sister built a burn pit and destroyed all the physical evidence of their involvement in the attack on the Capitol. 10/31/22PM Tr. at 5788-89. Young explained that they destroyed the evidence partially because "my sister and I were solidly in freak-out mode and scared[,] but also emotionally, because . . . that's when the embarrassment about the whole thing kicked in, too." *Id.* at 5789.

## IV.    THE CHARGES AND PLEA AGREEMENT

On June 23, 2021, Young waived his right to trial and pled guilty to Conspiracy, in

9

violation of 18 U.S.C. § 371, and Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2.

## V.    STATUTORY PENALTIES

As noted by the Presentence Report issued by the U.S. Probation Office, on the conspiracy count, Young faces up to five years of imprisonment, and on count two, he faces up to 20 years of imprisonment. ECF 1097 at ¶29. Each charge also carries a term of supervised release of not more than three years, a fine of up to $250,000, restitution, and a mandatory special assessment of $100. *Id.*

## VI.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c) and § 1B1.1, cmt. (background). The Guidelines apply to a "heartland of typical cases." *Koon v. United States*, 518 U.S. 81, 94-95 (1996). A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed "outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole. *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up).

### A.    The Calculation of the Parties and the Presentence Report

At the time of the plea agreement, the parties estimated Young's total offense level to be 26, resulting in a Guidelines range of 63 to 78 months' imprisonment. However, this estimate was based on the presumption of the applicability of two specific offense characteristics under U.S.S.G. § 2J1.2 having to do with the interference with the administration of justice. Since that time, the

10

D.C. Circuit decided *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024), which held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not apply to Congress' certification of electoral college votes. *See id.* at *8. Accordingly, the enhancement in U.S.S.G. § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice," does not apply where a defendant interfered solely with the certification of electoral college votes. U.S.S.G. § 2J1.2(b)(2); *Brock*, 2024 WL 875795, at *15. This holding also precludes application of the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of electoral college votes.

Thus, the following Sentencing Guidelines sections apply:

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2 | Base Offense Level | 14 |
| U.S.S.G. §2J1.2(b)(3)(C) | Extensive Scope, Planning, Preparation | +2 |
| U.S.S.G. §3C1.1 | Obstruction (destroying documents) | +2 |
| U.S.S.G. §3E1.1(a) | Acceptance of Responsibility | -3 |
| | Total | 15 |

It is worth noting that, in addition to the fact that this adjustment was not contemplated by the parties at the time of the plea agreement, the defendant does not meet the criteria at U.S.S.G. §4C1.1, as he played a role in transporting firearms in furtherance of his offenses of conviction. U.S.S.G. §4C1.1(a)(7).

The two counts of conviction are grouped for guideline calculation purposes because they involve the same victim and one or more acts or transactions. U.S.S.G. §3D1.2(b).

At a level 15, the recommended sentencing range would be 18 to 24 months of incarceration.[2]

### B.    Downward Departure for Substantial Assistance

The government moves, pursuant to U.S.S.G. § 5K1.1, for a downward departure for the substantial assistance Young has provided to law enforcement. The government submits that a seven-level downward departure is appropriate given the level and nature of assistance Young has provided.

The Guidelines provide that, "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1. In determining the appropriate level of reduction to apply, the Court should consider the following factors:

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5) the timeliness of the defendant's assistance.

---

[2] In other cases, following the Circuit's decision in *Brock*, the government has asked the Court to depart upward under Section 5K2.7 (Disruption of Governmental Function), and/or Section 5K2.6 (Weapons). The government is not advocating for such departures here, because the parties agreed under the terms of the plea agreement to not advocate for any upward or downward departures outside of the departure for substantial assistance to law enforcement. ECF 249 at 4.

U.S.S.G. § 5K1.1(a).

Here, the second and fifth factors clearly apply and can be quickly addressed. On the date of his arrest, Defendant Young waived his right to remain silent and his right to counsel and confessed. After obtaining counsel, Young continued to cooperate by debriefing with the government and pled guilty as soon as he was afforded the opportunity. In other words, Young's cooperation was extremely timely. U.S.S.G. § 5K1.1(a)(5).

Young's cooperation has also been truthful, complete, and reliable. Much of the information he provided has been corroborated by other witnesses and objective evidence such as messages, video, photographs, and other data recovered from his phone, from public source information and articles, and from the devices and accounts of others recovered by law enforcement during this investigation. In other words, the second factor listed above also supports a finding of substantial assistance by Young. U.S.S.G. § 5K1.1(a)(2).

With respect to the significance, usefulness, nature, and extent of Young's assistance (the first and third factors), Young debriefed extensively with the government, beginning on the day of his arrest in February 2021. At that very early stage of the investigation, Young was able to provide information that was helpful in identifying other members of the conspiracy, whom law enforcement would ultimately charge and arrest. Then, Young pled guilty, becoming the first person to plead guilty in these cases related to *U.S. v. Rhodes, et al.*, and the first person to plead guilty to a conspiracy offense related to January 6, 2021. Young agreed to have his plea and the cooperation aspects of his plea agreement be public. Young then testified before the grand jury and later testified at the trial against the leaders of the conspiracy, in the trial of *United States v.*

*Rhodes, et al.*, 22-cr-15-APM. Young expressed a willingness to testify at the trials of other co-conspirators, but his testimony ultimately was not needed in those subsequent trials.

Young's testimony was incredibly impactful. He was able to give context and meaning to scores of messages that he and his co-conspirators exchanged in the weeks between the election and the certification. Most notably, as the person who asked Rhodes on December 25, 2020, whether the group's trip to D.C. for the events of January 6 would be a "fool's errand," he was able to articulate what he meant by that question: namely, "I had been to the previous protests. I thought protests were a waste of time, they don't achieve anything." Young then explained how he was "regalvanized" to go to D.C. by Rhodes' promise that the trip would *not* be a "fool's errand," and that if President Trump failed to stop Congress from rubber stamping an unconstitutional fraud, the Oath Keepers would.

With respect to the group's actions on January 6, Young's testimony provided a first-hand account of the group's intent that day, and he linked Oath Keepers leader Rhodes to the group's decision to breach the building. Young testified that the group decided to enter the Capitol after Meggs spoke with Rhodes and then told the rest of the group, "We're in," which Young understood to mean that they were going to participate in this "Bastille type moment in history." And Young was able to link that decision to the weeks of planning that preceded it, testifying that they had "talked about doing something about the fraud in the election before we went there on the 6th[,] and then when the crowd got over the barricade and they went into the building, an opportunity presented itself to do something." According to Young, the group didn't need to tell each other it was time to act; rather, in Young's words, it was "common sense."

In sum, Young's cooperation has been incredibly significant, useful, and extensive. U.S.S.G. § 5K1.1(a)(1), (3).

This cooperation was not without risks. As mentioned above, Young was the first member of this conspiracy to plead guilty, and he did so pursuant to a public cooperation plea agreement, in a case that has garnered significant national interest and, sadly, controversy. Young then testified against the leaders of the conspiracy, identifying several of them in court. This took courage on Young's part. And it triggered backlash. Young was one of several cooperating defendants to receive threatening mail over the summer of 2021. Law enforcement was not able to identify the source of the mailings, and fortunately no violence came of the threats, but they understandably shook Young and his family. This Court should give Young credit for the danger and risk of injury to himself and to his family that resulted from his cooperation in this case. U.S.S.G. § 5K1.1(a)(4).

Taking all of these factors into account, a seven-level downward departure would reduce Young's adjusted offense level by about 47 percent from the government's estimated final adjusted offense level of 15, which he would have faced absent his cooperation in this matter. The government submits that such a reduction appropriately reflects the principles outlined above that this Court should consider in assessing the level of assistance Young provided to law enforcement.

### C.    Sentencing Guidelines Recommendation

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. ECF 1097 at ¶ 32. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at level 8, the defendant's Guidelines range is 0 to 6 months' imprisonment. Because level 8 is in Zone A of the Guidelines, the Court may impose a probationary sentence. U.S.S.G. §§ 5B1.1(a)(1), 5C1.1(b). In

other words, a sentence of three years of probation, with a requirement of restitution and community service, among other conditions, would be a Guidelines-compliant sentence at level 8.

## VII.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the government's recommended sentence.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Young' conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a Constitutional crisis. Perhaps even more alarmingly, these actions were not spontaneous for Young and his co-conspirators—they were in furtherance of a conspiracy hatched weeks earlier to take any means necessary, up to and including the use of force, to stop the lawful transfer of power from Donald Trump to Joseph Biden by obstructing Congress' certification of the Electoral College vote. Young came to D.C. understanding the potential for, and in many ways hoping to participate in, a forcible interruption of the certification of the election. He wanted to fight and knew his group had brought weapons to support the effort. And Young ultimately joined the violent mob that breached the Capitol in furtherance of this conspiracy. The nature and circumstances of Young's offense were of the utmost seriousness, and fully support the government's recommended sentence.

### B.   The History and Characteristics of the Defendant

At the time of this offense, Young was employed part-time, helping in the daycare his wife ran from their home. He had no criminal history. In other words, Young's crimes on January 6

were an isolated incident in an otherwise law-abiding life.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a significant period of probation, with conditions such as restitution, as part of the defendant's sentence. Young's criminal conduct on January 6 was the epitome of disrespect for the law. At the same time, Young has fully accepted responsibility for this offense, explaining during his trial testimony, after breaking down in tears, that he pled guilty "primarily obviously because I was guilty, and I know that. That's on a practical level. And on a personal level, to be forgiven, you have to confess. I feel like I needed to confess completely and wholly." That heartfelt, fulsome, and public acceptance of responsibility helps to promote respect for the law, as would a sentence that takes into account the steps Young has taken to cooperate with this investigation and to make amends for his offenses.

### D.    The Need for the Sentence to Afford Adequate Deterrence

Because of the unique circumstances of this case, a probationary sentence is appropriate "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] At the same time, early and public acceptance of responsibility, coupled with his cooperation with law enforcement, is something that should be rewarded, to encourage others to take similar responsibility for their conduct on January 6. For these reasons, a lengthy probationary sentence achieves the goal of general deterrence.

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. The government is recommending a Guidelines-compliant sentence, should the Court apply the government's recommended departure for substantial assistance to law enforcement.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). The government's recommended sentence does not create

unwarranted disparities in consideration of the substantial assistance the defendant has provided

to law enforcement, the risk to his and his family's safety that it has caused, and his complete and

public acceptance of responsibility for his conduct.[4]

## VIII.  RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579,

96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[5]  Generally, restitution under the VWPA must "be tied to the loss

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Here, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Young must pay

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

19

$2,000 in restitution.[6] ECF 249 at 10. As the Presentence Report reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. For the reasons outlined in greater detail in the restitution brief submitted in the related *Rhodes* matter, *see* Case No. 22-cr-15, ECF No. 654, which the government incorporates by reference, the government submits that $2,000 represents an appropriate and proportional amount of restitution for Defendant Young to pay.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of three years of probation, with the special conditions that the defendant perform 120 hours of community service and pay $2,000 in restitution and the mandatory $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    _____
Kathryn L. Rakoczy
D.C. Bar No. 994-559
Assistant U.S. Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W., Room 5.236
Kathryn.Rakoczy@usdoj.gov

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).